**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

**Case No.: _____**

GOVERNMENT EMPLOYEES
INSURANCE CO., GEICO
INDEMNITY CO., GEICO GENERAL
INSURANCE COMPANY and GEICO
CASUALTY CO.,

      Plaintiffs,

vs.

ALPHA MEDICINE AND REHAB,
LLC, ALDRICH MENDOZA, M.D.,
and PAUL WEBSTER, M.D.,

      Defendants.

_____/

**Jury Trial Demand**

## <u>COMPLAINT</u>

Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), sue Defendants and allege as follows.

1.    This action seeks to recover more than $1,690,000.00 that Defendants wrongfully obtained from GEICO by submitting thousands of fraudulent and unlawful no-fault ("no-fault", "personal injury protection", or "PIP") insurance charges through Defendant Alpha Medicine and Rehab, LLC ("Alpha Medicine") relating to medically unnecessary, illusory, unlawful, and otherwise non-reimbursable health care

1

services, including purported examinations and physical therapy services, (collectively

the "Fraudulent Services"), that purportedly were provided to Florida automobile

accident victims ("Insureds") who were eligible for coverage under GEICO PIP

insurance policies.

2.      In addition, GEICO seeks a declaration that it is not legally obligated to

pay reimbursement of more than $75,000.00 in pending, fraudulent, and unlawful PIP

claims that Defendants have submitted through Alpha Medicine, because:

(i)      at all relevant times, Defendants operated in pervasive violation of
Florida law, including Florida's Health Care Clinic Act, Fla. Stat. §
400.990 et seq. (the "Clinic Act"), Florida's False and Fraudulent
Insurance Claims Statute, Fla. Stat. § 817.234(7) (the "False and
Fraudulent Insurance Claims Statute"), and Florida's Physical Therapy
Practice Act, Fla. Stat. § 486.011-486.172 ("the Physical Therapy Act");

(ii)     the underlying Fraudulent Services were not medically necessary, and
were provided – to the extent that they were provided at all – pursuant to
a pre-determined fraudulent protocol designed to financially enrich
Defendants, rather than to treat or otherwise benefit the Insureds who
purportedly were subjected to them;

(iii)    in many cases, the Fraudulent Services were performed – to the extent
that they were performed at all – by massage therapists, and Florida law
prohibits PIP insurance reimbursement for massage or for services
performed by massage therapists;

(iv)     in many cases, the Fraudulent Services were not reimbursable as a matter
of Florida law, because they were performed – to the extent that they
were performed at all – by unsupervised physical therapist assistants;

(v)      in many cases, the billing submitted through Alpha Medicine
misrepresented the identities of the individuals who performed or directly
supervised the Fraudulent Services, and was submitted in violation of the
billing requirements set forth in the Florida Motor Vehicle No-Fault
Law, Fla. Stat. §§ 627.730-627.7405 (the "No-Fault Law");

2

(vi)    in many cases, the Fraudulent Services never were provided in the first instance; and

(vii)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to fraudulently inflate the charges submitted to GEICO.

3.    As set forth below, Defendants at all relevant times have known that:

(i)    Defendants operated in pervasive violation of Florida law, including the Clinic Act, the False and Fraudulent Insurance Claims Statute, and the Physical Therapy Act;

(ii)    the underlying Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iii)    in many cases, the Fraudulent Services at Alpha Medicine were performed – to the extent that they were performed at all – by massage therapists, and therefore were ineligible for PIP reimbursement;

(iv)    in many cases, the Fraudulent Services at Alpha Medicine were performed – to the extent that they were performed at all – by unsupervised physical therapist assistants, and therefore were ineligible for PIP reimbursement;

(v)    in many cases, the billing submitted through Alpha Medicine misrepresented the identities of the individuals who performed or directly supervised the Fraudulent Services, and was submitted in violation of the billing requirements set forth in the No-Fault Law, rendering the charges ineligible for PIP reimbursement;

(vi)    in many cases, the Fraudulent Services never were provided in the first instance; and

(vii)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to fraudulently inflate the charges submitted to GEICO.

4.      As such, Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that were billed to GEICO through Alpha Medicine.

5.      The chart annexed hereto as Exhibit "1" sets forth a large and representative sample of the fraudulent and unlawful claims that have been identified to date that Defendants have submitted, or caused to be submitted, to GEICO.

6.      Defendants' fraudulent and unlawful scheme began no later than 2021, and has continued uninterrupted since that time. As a result of Defendants' fraudulent and unlawful scheme, GEICO has incurred damages of more than $1,690,000.00.


## THE PARTIES

### I.      Plaintiffs

7.      Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co. (collectively, "GEICO") are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in Florida.

### II.      Defendants

8.      Defendant Alpha Medicine is a Florida limited liability with its principal place of business in Fort Myers, Florida. Alpha Medicine was organized in Florida on November 24, 2021, and was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

4

9.    Defendant Paul Webster, M.D. ("Webster") resides in and is a citizen of Florida. Webster was licensed to practice medicine in Florida on March 10, 1995, and is board certified in anesthesiology and pain medicine, but is not a board certified orthopedic surgeon or physiatrist. Webster purportedly owned and controlled Alpha Medicine until August 19, 2022, purported to be the member of Alpha Medicine during that period, falsely purported to supervise the business activities at Alpha Medicine, and used Alpha Medicine as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

10.    Defendant Aldrich Mendoza, M.D. ("Mendoza") resides in and is a citizen of Florida. Mendoza was licensed to practice medicine in Florida on August 15, 2019, and is board certified in family medicine, but is not a board certified orthopedic surgeon or physiatrist. Mendoza purportedly owned and controlled Alpha Medicine from August 19, 2022 to the present, purported to be the member of Alpha Medicine during that period, falsely purported to supervise the business activities at Alpha Medicine, and used Alpha Medicine as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

**III.    Other Relevant Individuals and Entity**

11.    Although GEICO does not currently name them as Defendants in this action, Leonilo Trono, L.P.T. ("Trono"), Amy Gonzalez, A.P.R.N. ("A. Gonzalez"), Ismary Ibarra, A.P.R.N. ("Ibarra"), Lester Alvarez, A.P.R.N. ("Alvarez"), Juan Carlos Diaz, P.A. ("Diaz"), Diana Gomez, A.P.R.N. ("Gomez"), Drew Rober, P.T.A. ("Rober"), Kenner Gutierrez, P.T.A. ("Gutierrez"), Shayna Zarre, P.T.A.

("Zarre"), Dayami Rosales, A.P.R.N. ("Rosales"), Carme Philistin, A.P.R.N. ("Philistin"), Arnovis Echevarria, A.P.R.N. ("Echevarria"), Ninedty Muniz, A.P.R.N. ("Muniz"), Abel Murillo, M.D. ("Murillo"), and Angela Moore, L.M.T. ("Moore") are relevant to understanding the claims asserted by GEICO in this action.

12.     Trono is a physical therapist, was employed or associated with Alpha Medicine, and purported to perform Fraudulent Services on behalf of Alpha Medicine, at the direction of Defendants.

13.     A. Gonzalez is an advanced practice registered nurse, was employed by or associated with Alpha Medicine, and purported to perform Fraudulent Services on behalf of Alpha Medicine, at the direction of Defendants.

14.     Ibarra is an advanced practice registered nurse, was employed by or associated with Alpha Medicine, and purported to perform Fraudulent Services on behalf of Alpha Medicine, at the direction of Defendants.

15.     Alvarez is an advanced practice registered nurse, was employed by or associated with Alpha Medicine, and purported to perform Fraudulent Services on behalf of Alpha Medicine, at the direction of Defendants.

16.     Diaz is a physical therapist assistant, was employed by or associated with Alpha Medicine, and purported to perform Fraudulent Services on behalf of Alpha Medicine, at the direction of Defendants.

17.     Gomez is an advanced practice registered nurse, was employed by or associated with Alpha Medicine, and purported to perform Fraudulent Services on behalf of Alpha Medicine, at the direction of Defendants.

18.    Rober is a physical therapist assistant, was employed by or associated with Alpha Medicine, and purported to perform Fraudulent Services on behalf of Alpha Medicine, at the direction of Defendants.

19.    Gutierrez is a physical therapist assistant, was employed by or associated with Alpha Medicine, and purported to perform Fraudulent Services on behalf of Alpha Medicine, at the direction of Defendants.

20.    Zarre is a physical therapist assistant, was employed by or associated with Alpha Medicine, and purported to perform Fraudulent Services on behalf of Alpha Medicine, at the direction of Defendants.

21.    Rosales is an advanced practice registered nurse, was employed by or associated with Alpha Medicine, and purported to perform Fraudulent Services on behalf of Alpha Medicine, at the direction of Defendants.

22.    Philistin is an advanced practice registered nurse, was employed by or associated with Alpha Medicine, and purported to perform Fraudulent Services on behalf of Alpha Medicine, at the direction of Defendants.

23.    Echevarria is an advanced practice registered nurse, was employed by or associated with Alpha Medicine, and purported to perform Fraudulent Services on behalf of Alpha Medicine, at the direction of Defendants.

24.    Muniz is an advanced practice registered nurse, was employed by or associated with Alpha Medicine, and purported to perform Fraudulent Services on behalf of Alpha Medicine, at the direction of Defendants.

25.     Murillo is a licensed physician, was employed by or associated with Alpha Medicine, and purported to perform Fraudulent Services on behalf of Alpha Medicine, at the direction of Defendants.

26.     Moore is a licensed massage therapist, was employed by or associated with Alpha Medicine, and purported to perform Fraudulent Services on behalf of Alpha Medicine, at the direction of Defendants.

## JURISDICTION AND VENUE

27.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interests and costs, exceeds the jurisdictional threshold of $75,000.00, and is between citizens of different states.

28.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

29.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

30.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Middle District of Florida is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS

## I.      Overview of Pertinent Law Governing No-Fault Insurance Reimbursement

31.    Florida has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries. The statutory system is embodied within the No-Fault Law, which requires automobile insurers to provide Personal Injury Protection benefits ("PIP Benefits") to Insureds.

32.    Under the No-Fault Law, an Insured can assign his or her right to PIP Benefits to health care services providers in exchange for those services. Pursuant to a duly executed assignment, a health care services provider may submit claims directly to an insurance company in order to receive payment for medically necessary services, using the required claim/billing forms, including the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

33.    In order for a health care service to be eligible for PIP reimbursement, it must be "lawfully" provided.

34.    Pursuant to the No-Fault Law, "lawful" or "lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment."

35.    Thus, health care services providers may not recover PIP Benefits for health care services that were not provided in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of Florida and federal law related to the provision of the underlying services or treatment.

36.    Pursuant to the Clinic Act, and subject to certain limited exceptions, a clinic license issued by the Florida Agency for Health Care Administration is required in order to operate a health care practice in Florida.

37.    However, the Clinic Act provides an exemption from the clinic licensing requirements for:

> A sole proprietorship, group practice, partnership, or corporation that provides health care services by licensed health care practitioners . . . that is wholly owned by one or more licensed health care practitioners, or the licensed health care practitioners set forth in this paragraph and the spouse, parent, child, or sibling of a licensed health care practitioner if one of the owners who is a licensed health care practitioner is supervising the business activities and is legally responsible for the entity's compliance with all federal and state laws.

(Emphasis added).

38.    Thus, in order for a health care practice to qualify for the "wholly owned" exemption under the Clinic Act, the licensed health care practitioner who owns the practice has a continuing obligation to supervise the business activities of the practice and remain legally responsible for the practice's compliance with all federal and state laws. Any failure to fulfill these requirements automatically voids a practice's exemption.

39.    Pursuant to the Clinic Act, a health care practice operating in Florida without a valid exemption from the health care clinic licensing requirements must – among other things – obtain a clinic license and appoint a physician as medical director who must "[c]onduct systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful", and take immediate corrective action upon discovery of a fraudulent or unlawful charge. See Fla. Stat. § 400.9935(1).  In addition, a clinic

medical director must "[e]nsure that all health care practitioners at the clinic have active appropriate certification or licensure for the level of care being provided."

40.    Pursuant to the Clinic Act, "[a] charge or reimbursement claim made by or on behalf of a clinic that is required to be licensed . . . but that is not so licensed, or that is otherwise operating in violation of this part . . . is an unlawful charge" and is ineligible for payment.

41.    Under the False and Fraudulent Insurance Claims Statute, it is unlawful for a health care provider to engage in the general business practice of waiving, or failing to make a good-faith effort to collect, co-payments or deductibles from PIP patients.

42.    Failure to make a good-faith effort to collect co-payments or deductibles renders the charges submitted by a health care provider unlawful and noncompensable.

43.    Pursuant to the No-Fault Law, insurers such as GEICO are only required to pay PIP Benefits for "medically necessary" services. At the same time, a health care services provider, including a clinic organized under the Clinic Act, is only eligible to receive PIP Benefits for medically necessary services.

44.    Pursuant to the No-Fault Law, "medically necessary" means:

a medical service or supply that a prudent physician would provide for the purpose of preventing, diagnosing, or treating an illness, injury, disease, or symptom in a manner that is:

(a)    In accordance with generally accepted standards of medical practice;
(b)    Clinically appropriate in terms of type, frequency, extent, site, and duration; and

11

(c)    Not primarily for the convenience of the patient, physician, or other health care provider.

45.    Prior to January 1, 2013, the No-Fault Law permitted health care services providers, including clinics licensed under the Clinic Act, to collect PIP Benefits for massage therapy and for services performed by massage therapists.

46.    However, the No-Fault Law was amended, effective January 1, 2013, PIP reimbursement for massage or for services performed by massage therapists.

47.    Pursuant to the Physical Therapy Act: (i) massage therapists may not practice physical therapy, or hold themselves out as being able to practice physical therapy, unless they have an actual license to practice physical therapy, as opposed to massage therapy; and (ii) unlicensed and unsupervised individuals may not practice physical therapy, or hold themselves out as being able to practice physical therapy.

48.    According to the Physical Therapy Act, a "'[p]hysical therapist assistant' means a person who is licensed in accordance with the provisions of this chapter to perform patient-related activities, including the use of physical agents, whose license is in good standing, and whose activities are performed under the direction of a physical therapist as set forth in rules adopted pursuant to this chapter. Patient-related activities performed by a physical therapist assistant for a board-certified orthopedic physician or physiatrist licensed pursuant to chapter 458 [Medical Practice] or chapter 459 [Osteopathic Medicine] or a practitioner licensed under chapter 460 [Chiropractic] shall be under the general supervision of a physical therapist, but shall not require onsite supervision by a physical therapist. Patient-related activities performed for all

12

other health care practitioners licensed under chapter 458 [Medical Practice] or chapter 459 [Osteopathic Medicine] and those patient-related activities performed for practitioners licensed under chapter 461 [Podiatric Medicine] or chapter 466 [Dentistry] shall be performed under the onsite supervision of a physical therapist."

49.    Pursuant to the Physical Therapy Act and the No-Fault Law, insurers such as GEICO are not required to pay for any services performed by massage therapists, or for physical therapy services that are unlawfully performed by unlicensed and unsupervised individuals.

50.    Pursuant to the No-Fault Law, insurers such as GEICO are not required to pay PIP Benefits:

(i)    for any service or treatment that was not lawful at the time rendered;

(ii)   to any person who knowingly submits a false or misleading statement relating to the claim or charges;

(iii)  for any treatment or service that is upcoded; or

(iv)   with respect to a bill or statement that does not substantially meet the billing requirements set forth in the No-Fault Law.

51.    The No-Fault Law's billing requirements provide – among other things – that all PIP billing must, to the extent applicable, comply with the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms, as well as the guidelines promulgated by the American Medical Association ("AMA") in connection with the use of current procedural terminology ("CPT") codes.

52.     The instructions promulgated by CMS for the completion of HCFA-1500 forms require, among other things, that all HCFA-1500 forms set forth, in Box 31, the identity of the individual health care practitioner who personally performed or directly supervised the underlying health care services.

53.     To "directly supervise" a service, a health care practitioner "must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician must be present in the room when the procedure is performed." See, e.g., Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set.

54.     Insurers are not required to pay PIP Benefits to health care providers that misrepresent, in their billing, the identity of the individual health care practitioners who performed or directly supervised the underlying services.

II.     **The Defendants' Fraudulent and Unlawful Scheme**

55.     Since at least 2021, and continuing through the present day, Defendants devised and implemented a fraudulent and unlawful scheme pursuant to which they billed GEICO millions of dollars for unlawful, medically unnecessary, illusory, and otherwise non-reimbursable services.

A.     **The Defendants' Violations of the Clinic Act**

56.     As part of Defendants' fraudulent and unlawful scheme, Mendoza and Webster operated Alpha Medicine in pervasive violation of the Clinic Act.

14

57.    Alpha Medicine was a "clinic" within the meaning of the Clinic Act, in that it was an entity "where health care services [were] provided to individuals and which tender[ed] charges for reimbursement for services."

58.    However, Alpha Medicine never had a clinic license or medical director.

59.    Instead, Alpha Medicine was owned by Webster and then Mendoza, and purported to operate under the "wholly owned" exemption from the Clinic Act's licensing, operating, and medical director requirements.

60.    However, Mendoza and Webster never legitimately supervised the business activities of Alpha Medicine, inasmuch as Mendoza and Webster never conducted legitimate reviews of the billing or treatment records from Alpha Medicine to ensure that the billing was not fraudulent or unlawful, never ensured that all health care practitioners at Alpha Medicine had active appropriate certification or licensure for the level of care being provided, and never made any attempt to remedy the fraudulent and unlawful charges submitted through Alpha Medicine, as described herein.

61.    To the contrary, Mendoza and Webster directed and participated in the fraudulent and unlawful scheme described herein.

62.    Accordingly, at all relevant times Alpha Medicine operated in violation of the Clinic Act.

63.    In the claims identified in Exhibit "1", Defendants' PIP charges were fraudulent and unlawful in that they misrepresented that Alpha Medicine was

compliant with Florida law and eligible to receive PIP reimbursement in the first instance.

64.     In fact, Alpha Medicine never was compliant with Florida law or eligible to receive PIP reimbursement, because it operated in pervasive violation of the Clinic Act.

**B.     The Unlawful Billing for Physical Therapy Performed by Massage Therapists and Unsupervised Physical Therapist Assistants at Alpha Medicine, and Misrepresentations Regarding the Identities of the Actual Treating Practitioners**

65.     Defendants billed for a limited range of health care services through Alpha Medicine, specifically: (i) purported initial patient examinations; (ii) purported follow-up patient examinations; and (iii) purported physical therapy services, including hold/cold packs, mechanical traction, ultrasound therapy, neuromuscular reeducation, therapeutic exercises, manual therapy, and electrical stimulation, among other modalities.

66.     As set forth in Exhibit "1", the purported physical therapy services constituted the vast majority of the services that Defendants billed through Alpha Medicine to GEICO.

67.     In the claims identified in Exhibit "1", the purported physical therapy services were unlawfully performed and billed to GEICO – to the extent that they were performed at all – by massage therapists, including Moore, and unsupervised physical therapist assistants, including Gutierrez, Rober, Diaz, and Zarre.

68.     Pursuant to the Physical Therapy Act, because neither Webster, Mendoza, Murillo, nor any other physicians associated with Alpha Medicine were board-certified orthopedic physicians or physiatrists, the physical therapist assistants at Alpha Medicine – including Gutierrez, Rober, Diaz, and Zarre – could not lawfully perform health care services at Alpha Medicine without the onsite supervision of a licensed physical therapist.

69.     What is more, the No-Fault Law and the Physical Therapy Act prohibited Alpha Medicine from recovering PIP Benefits for services – including but not limited to physical therapy services – provided by massage therapists.

70.     Defendants were aware of the fact that they could not legally recover PIP Benefits for services provided by massage therapists or unsupervised physical therapist assistants.

71.     As a result, and in order to conceal the fact Moore, Rober, Gutierrez, Zarre, and other massage therapists and unsupervised physical therapist assistants performed the purported physical therapy services that were unlawfully billed through Alpha Medicine to GEICO, Defendants deliberately omitted any reference to Moore, Rober, Gutierrez, Zarre, and other massage therapists and unsupervised physical therapist assistants associated with Alpha Medicine from the HCFA-1500 forms that they used to bill for the putative physical therapy services.

72.     Instead, in the claims for physical therapy services identified in Exhibit "1", Defendants routinely and falsely listed Trono and Webster in Box 31 of the

pertinent HCFA-1500 forms, and thereby falsely represented that Trono and Webster personally performed or directly supervised the underlying physical therapy services.

73.    In fact, Trono and Webster, who were simultaneously purporting to perform or directly supervise large numbers of health care services at numerous locations on individual dates, did not legitimately perform or directly supervise the physical therapy services in the claims identified in Exhibit "1", and could not have legitimately performed or directly supervised the physical therapy services.

74.    For example:

(i)    On January 26, 2022, Alpha Medicine and Webster purported to provide at least 17 individual physical therapy services to at least three individual GEICO Insureds at Alpha Medicine's Cape Coral location, and falsely contended in the resulting bills to GEICO that Webster personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 4.25 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Webster also purported to personally perform, or at least directly supervise: (1) one 20-minute follow-up examination and one 45-minute initial examination on two individual GEICO Insureds at Alpha Medicine's Cape Coral location; and (2) at least 60 additional physical therapy services purportedly provided to at least 12 additional GEICO Insureds at Alpha Medicine's Naples, Fort Myers, and Kissimmee locations, including at least 15 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 20 hours of services that Webster purported to personally perform, or at least directly supervise, at several different locations on January 26, 2022.

(ii)   On February 4, 2022, Alpha Medicine and Webster purported to provide at least 34 individual physical therapy services to at least six individual GEICO Insureds at Alpha Medicine's Fort Myers location, and falsely contended in the resulting bills to GEICO that Webster personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 8.5 hours of

physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Webster also purported to personally perform, or at least directly supervise: (1) one twenty-minute follow-up examination on one individual GEICO Insured at Alpha Medicine's Fort Myers location, and one twenty-minute follow-up examination on one <u>additional</u> GEICO Insured at Alpha Medicine's Punta Gorda location; and (2) at least 50 <u>additional</u> physical therapy services purportedly provided to at least 10 <u>additional</u> GEICO Insureds at Alpha Medicine's Kissimmee, Punta Gorda, and Cape Coral locations, including at least 12.5 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 21.5 hours of services that Webster purported to personally perform, or at least directly supervise, at several different locations on February 4, 2022.

(iii)   On March 4, 2022, Alpha Medicine and Webster purported to provide at least 65 individual physical therapy services to at least seven individual GEICO Insureds at Alpha Medicine's Fort Myers location, and falsely contended in the resulting bills to GEICO that Webster personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 16.25 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Webster also purported to personally perform, or at least directly supervise: (1) one forty-five minute initial examination, one twenty-minute follow-up examination, and one thirty-minute follow-up examination on three individual GEICO Insureds at Alpha Medicine's Fort Myers location, and one twenty-minute follow-up examination on one <u>additional</u> GEICO Insured at Alpha Medicine's Punta Gorda location; and (2) at least 39 <u>additional</u> physical therapy services purportedly provided to at least eight <u>additional</u> GEICO Insureds at Alpha Medicine's Kissimmee, Cape Coral, and Punta Gorda locations, including at least 9.75 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 27.5 hours of services that Webster purported to personally perform, or at least directly supervise, at several different locations on March 4, 2022.

(iv)   On March 14, 2022, Alpha Medicine and Webster purported to provide at least 11 individual physical therapy services to at least one individual GEICO Insured at Alpha Medicine's Cape Coral location, and falsely

19

contended in the resulting bills to GEICO that Webster personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 2.75 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insured throughout the services. That same day, Webster also purported to personally perform, or at least directly supervise: (1) one thirty-minute initial examination and one twenty-minute follow-up examination on two individual GEICO Insureds at Alpha Medicine's Cape Coral location; and (2) at least 136 additional physical therapy services purportedly provided to at least 11 additional GEICO Insureds at Alpha Medicine's Fort Myers, Kissimmee, Naples, and Punta Gorda locations, including at least 34 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 37.5 hours of services that Webster purported to personally perform, or at least directly supervise, at several different locations on March 14, 2022.

(v)    On March 28, 2022, Alpha Medicine and Webster purported to provide at least 65 individual physical therapy services to at least 12 individual GEICO Insureds at Alpha Medicine's Fort Myers location, and falsely contended in the resulting bills to GEICO that Webster personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 16.25 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Webster also purported to personally perform, or at least directly supervise: 1) five thirty-minute follow-up examinations on two individual GEICO Insureds at Alpha Medicine's Fort Myers location, and one fifteen-minute initial examination and two twenty-minute follow-up examination on three additional GEICO Insureds at Alpha Medicine's Cape Coral location; and (2) at least 53 additional physical therapy services purportedly provided to at least nine additional GEICO Insureds at Alpha Medicine's Kissimmee, Orlando, Cape Coral, Punta Gorda, and Layton locations, including at least 13.25 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 32.5 hours of services that Webster purported to personally perform, or at least directly supervise, at several different locations on March 28, 2022.

(vi)    On April 8, 2022, Alpha Medicine and Webster purported to provide at least 24 individual physical therapy services to at least four individual

GEICO Insureds at Alpha Medicine's Port Charlotte location, and falsely contended in the resulting bills to GEICO that Webster personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 6 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Webster also purported to personally perform, or at least directly supervise: 1) one twenty-minute follow-up examination on one individual GEICO Insured at Alpha Medicine's Port Charlotte location, and two twenty-minute follow-up examinations on two <u>additional</u> GEICO Insureds at Alpha Medicine's Cape Coral location; and (2) at least 82 <u>additional</u> physical therapy services purportedly provided to at least 17 <u>additional</u> GEICO Insureds at Alpha Medicine's Cape Coral, Kissimmee, Naples, Orlando, and Fort Myers locations, including at least 20.5 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 27.5 hours of services that Webster purported to personally perform, or at least directly supervise, at several different locations on April 8, 2022.

(vii) On April 15, 2022, Alpha Medicine and Webster purported to provide at least 55 individual physical therapy services to at least nine individual GEICO Insureds at Alpha Medicine's Fort Myers location, and falsely contended in the resulting bills to GEICO that Webster personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 13.75 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Webster also purported to personally perform, or at least directly supervise: (1) one thirty-minute initial examination and three thirty-minute follow-up examinations on four individual GEICO Insureds at Alpha Medicine's Fort Myers location, and one thirty-minute initial examination, one forty-five-minute initial examination, two sixty-minute initial examinations, and two twenty-minute follow-up examinations on five <u>additional</u> GEICO Insureds at Alpha Medicine's Port Charlotte, Naples, Orlando, Cape Coral, and Port Charlotte locations; and (2) at least 60 <u>additional</u> physical therapy services purportedly provided to at least 13 <u>additional</u> GEICO Insureds at Alpha Medicine's Cape Coral, Naples, Orlando, and Port Charlotte locations, including at least 15 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 34.5 hours of services that Webster purported to personally perform,

or at least directly supervise, at several different locations on April 15, 2022.

(viii)    On June 16, 2022, Alpha Medicine and Webster purported to provide at least 36 individual physical therapy services to at least three individual GEICO Insureds at Alpha Medicine's Fort Myers location, and falsely contended in the resulting bills to GEICO that Webster personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least nine hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Webster also purported to personally perform, or at least directly supervise: (1) six twenty-minute follow-up examinations on one individual GEICO Insured at Alpha Medicine's Fort Myers location, and three twenty-minute follow-up examinations and two thirty-minute follow-up examinations on three additional GEICO Insureds at Alpha Medicine's Orlando, Naples, and Sebring locations; and (2) at least 44 additional physical therapy services purportedly provided to at least nine additional GEICO Insureds at Alpha Medicine's Cape Coral, Naples, Orlando, and Port Charlotte locations, including at least 11 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 24 hours of services that Webster purported to personally perform, or at least directly supervise, at several different locations on June 16, 2022.

(ix)    On September 15, 2022, Alpha Medicine, Mendoza, and Trono purported to provide at least 84 individual physical therapy services to at least six individual GEICO Insureds at Alpha Medicine's Fort Myers location, and falsely contended in the resulting bills to GEICO that Trono personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 21 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Trono also purported to personally perform, or at least directly supervise, at least 24 additional physical therapy services purportedly provided to at least four additional GEICO Insureds at Alpha Medicine's Port Charlotte, Labelle, and Cape Coral locations, including at least six hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 27 hours of services that Trono purported to

22

personally perform, or at least directly supervise, at several different locations on September 15, 2022.

(x)    On November 15, 2022, Alpha Medicine, Mendoza, and Trono purported to provide at least 37 individual physical therapy services to at least three individual GEICO Insureds at Alpha Medicine's Cape Coral location, and falsely contended in the resulting bills to GEICO that Trono personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 9.25 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Trono also purported to personally perform, or at least directly supervise, at least 72 <u>additional</u> physical therapy services purportedly provided to at least six <u>additional</u> GEICO Insureds at Alpha Medicine's Fort Myers, Lehigh Acres, and Labelle locations, including at least 18 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 27.25 hours of services that Trono purported to personally perform, or at least directly supervise, at several different locations on November 15, 2022.

(xi)    On December 6, 2022, Alpha Medicine, Mendoza, and Trono purported to provide at least 62 individual physical therapy services to at least six individual GEICO Insureds at Alpha Medicine's Fort Myers location, and falsely contended in the resulting bills to GEICO that Trono personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 15.5 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Trono also purported to personally perform, or at least directly supervise, at least 44 <u>additional</u> physical therapy services purportedly provided to at least six <u>additional</u> GEICO Insureds at Alpha Medicine's Cape Coral, Labelle, Lehigh Acres, and Port Charlotte locations, including at least 11 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 26.5 hours of services that Trono purported to personally perform, or at least directly supervise, at several different locations on December 6, 2022.

(xii)    On February 22, 2023, Alpha Medicine, Mendoza, and Trono purported to provide at least 32 individual physical therapy services to at least two

individual GEICO Insureds at Alpha Medicine's Naples location, and falsely contended in the resulting bills to GEICO that Trono personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least eight hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Trono also purported to personally perform, or at least directly supervise, at least 79 <u>additional</u> physical therapy services purportedly provided to at least seven <u>additional</u> GEICO Insureds at Alpha Medicine's Fort Myers, Cape Coral, Port Charlotte, and Miami locations, including at least 19.75 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 27.75 hours of services that Trono purported to personally perform, or at least directly supervise, at several different locations on February 22, 2023.

(xiii)   On March 8, 2023, Alpha Medicine. Mendoza, and Trono purported to provide at least 46 individual physical therapy services to at least four individual GEICO Insureds at Alpha Medicine's Fort Myers location, and falsely contended in the resulting bills to GEICO that Trono personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 11.5 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Trono also purported to personally perform, or at least directly supervise, at least 116 <u>additional</u> physical therapy services purportedly provided to at least eight <u>additional</u> GEICO Insureds at Alpha Medicine's Naples, Cape Coral, Port Charlotte, and Miami locations, including at least 29 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 40.5 hours of services that Trono purported to personally perform, or at least directly supervise, at several different locations on March 8, 2023.

(xiv)   On June 1, 2023, Alpha Medicine, Mendoza, and Trono purported to provide at least 27 individual physical therapy services to at least three individual GEICO Insureds at Alpha Medicine's Port Charlotte location, and falsely contended in the resulting bills to GEICO that Trono personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 6.75 hours of physical therapy services that required direct, one-to-one patient

contact between the treating provider and the Insureds throughout the services. That same day, Trono also purported to personally perform, or at least directly supervise, at least 80 <u>additional</u> physical therapy services purportedly provided to at least 11 <u>additional</u> GEICO Insureds at Alpha Medicine's Fort Myers, Cape Coral, and Naples locations, including at least 20 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 26.75 hours of services that Trono purported to personally perform, or at least directly supervise, at several different locations on June 1, 2023.

(xv)    On September 7, 2023, Alpha Medicine, Mendoza, and Trono purported to provide at least 43 individual physical therapy services to at least six individual GEICO Insureds at Alpha Medicine's Cape Coral location, and falsely contended in the resulting bills to GEICO that Trono personally performed, or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 10.75 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Trono also purported to personally perform, or at least directly supervise, 98 <u>additional</u> physical therapy services purportedly provided to at least 11 <u>additional</u> GEICO Insureds at Alpha Medicine's Fort Myers, Labelle, Miami, Naples, and Port Charlotte locations, including at least 24.5 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 35.25 hours of services that Trono purported to personally perform, or at least directly supervise, at several different locations on September 7, 2023.

75.    These are only representative examples. In the claims for physical therapy services identified in Exhibit "1", Defendants routinely falsely represented that Trono and Webster had performed – or at least directly supervised – an impossible number of physical therapy services on individual dates, considering the amount of services they simultaneously were purporting to perform or directly supervise at numerous different locations on those same dates.

76.    It is impossible that Trono and Webster routinely performed or directly supervised such a high volume of services, at multiple locations, on individual dates.

77.    Furthermore, upon information and belief, the fraudulent billing for physical therapy services that Defendants submitted or caused to be submitted through Alpha Medicine to GEICO constituted only a fraction of the total fraudulent billing for physical therapy services that they submitted to all of the automobile insurers in the Florida automobile insurance market.

78.    GEICO is only one of the automobile insurance companies doing business in the Florida automobile insurance market.

79.    It is extremely improbable, to the point of impossibility, that Defendants only submitted fraudulent billing to GEICO, and that they did not simultaneously bill other automobile insurers.

80.    Thus, upon information and belief, the impossible number of physical therapy services that Trono and Webster purported to directly supervise or provide to GEICO Insureds at Alpha Medicine at numerous locations on individual dates of service, including the date of service identified above, constituted only a fraction of the total number of physical therapy services that Trono and Webster purported to perform or directly supervise on those same dates of service.

81.    In fact, Alpha Medicine did not actually provide any legitimate physical therapy services to GEICO Insureds.

82.    Rather: (i) the putative "physical therapy" services that Defendants purported to provide through Alpha Medicine to Insureds were unlawfully performed,

to the extent that they were performed at all, by massage therapists and unsupervised physical therapist assistants associated with Alpha Medicine; and (ii) none of the putative "physical therapy" services that were billed through Alpha Medicine to GEICO actually constituted physical therapy, because the massage therapists and unsupervised physical therapist assistants associated with Alpha Medicine were not and never have been licensed as physical therapists.

83.    In the claims for "physical therapy" services identified in Exhibit "1", Defendants routinely fraudulently misrepresented that the physical therapy services were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the purported physical therapy services were performed – to the extent that they were performed at all – by massage therapists and unsupervised physical therapist assistants, in contravention of Florida law;

(ii)    Alpha Medicine could not lawfully recover PIP Benefits for the purported physical therapy services, because they were performed by massage therapists and unsupervised physical therapist assistants; and because it operated in violation of Florida law; and

(iii)   Defendants systematically fraudulently misrepresented and concealed the identities of the individuals who either personally performed or directly supervised the putative physical therapy services.

84.    In this context, Mendoza and Webster – who at all relevant times purported to own Alpha Medicine – did not, and could not have, legitimately supervised the business activities of Alpha Medicine.

85.    Had Mendoza and Webster legitimately supervised the business activities of Alpha Medicine, Mendoza and Webster would have noted – among other things –

that the physical therapy services were unlawfully performed by massage therapists and unsupervised physical therapist assistants, and unlawfully billed to GEICO.

86.    Mendoza and Webster failed to do so because they never legitimately supervised the business activities of Alpha Medicine.

**C.    The Defendants' Unlawful General Business Practice of Failing to Make a Good Faith Effort to Collect Co-Payments or Deductibles from Their Patients**

87.    During the relevant time period, Defendants unlawfully engaged in the general business practice of waiving, or failing to make a good-faith effort to collect, co-payments and deductibles from their patients in violation of the False and Fraudulent Insurance Claims Statute.

88.    In keeping with this fact, in virtually all of the thousands of bills (i.e., the HCFA-1500 forms) submitted through Alpha Medicine to GEICO for Defendants' Fraudulent Services, Defendants represented that they did not collect any money, whether it be a copayment or deductible, from the patients.

89.    In the claims identified in Exhibit "1", Defendants routinely falsely represented that the underlying health care services were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable because Defendants engaged in the unlawful general business practice of waiving, or failing to make a good-faith effort to collect, co-payments and deductibles from their patients in violation of the False and Fraudulent Insurance Claims Statute.

90.    In this context, Mendoza and Webster – who at all relevant times purported to own Alpha Medicine – did not, and could not have, legitimately supervised the business activities of Alpha Medicine.

91.    Had Mendoza and Webster legitimately supervised the business activities of Alpha Medicine, Mendoza and Webster would have ensured – among other things – that Alpha Medicine complied with the False and Fraudulent Insurance Claims Statute.

92.    Mendoza and Webster failed to do so because they never legitimately supervised the business activities of Alpha Medicine.

**D.    The Defendants' Fraudulent Treatment and Billing Protocol**

93.    In the claims identified in Exhibit "1", almost none of the Insureds whom Defendants purported to treat suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced.

94.    Even so, in the claims identified in Exhibit "1", Defendants purported to subject virtually every Insured to a medically unnecessary course of "treatment" that was provided pursuant to a pre-determined fraudulent protocol designed to maximize the billing that they could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to the "treatment."

95.    Defendants purported to provide their pre-determined fraudulent treatment protocol to the Insureds in the claims identified in Exhibit "1" without regard for the Insureds' individual symptoms or presentation, or – in most cases – the

total absence of any actual continuing medical problem arising from any actual automobile accidents.

96.    Each step in the Defendants' fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit Defendants to generate and falsely justify the maximum amount of fraudulent PIP billing for each Insured.

97.    No legitimate physician, health care practitioner, or health care practice would permit the fraudulent treatment and billing protocol described below to proceed under his, her, or its auspices.

98.    Defendants permitted the fraudulent treatment and billing protocol designed below to proceed under their auspices because: (i) Alpha Medicine was, at all relevant times, operating in violation of the Clinic Act, without legitimate oversight by Mendoza and Webster; and (ii) Defendants sought to profit from the fraudulent billing they submitted to GEICO and other insurers.

## 1.    The Fraudulent and Unlawful Charges for Initial Examinations at Alpha Medicine

99.    As an initial step in the Defendants' fraudulent scheme, Defendants purported to provide most of the Insureds in the claims identified in Exhibit "1" with an initial examination.

100.    In the claims identified in Exhibit "1", the substantial majority of initial examinations at Alpha Medicine were then billed by Defendants through Alpha Medicine to GEICO under (i) CPT code 99204, typically resulting in a charge between

$487.50 and $1,300.00 for each putative examination; or (ii) CPT code 99203, typically resulting in a charge between $300.00 and $800.00 for each putative examination.

101.    In the claims for initial examinations identified in Exhibit "1", the charges for the initial examinations were fraudulent in that they misrepresented Alpha Medicine's eligibility to collect PIP Benefits in the first instance.

102.    In fact, and as set forth herein, Alpha Medicine never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the licensing and operating requirements set forth in the Clinic Act, the False and Fraudulent Insurance Claims Statute, and the Physical Therapy Act.

103.    As set forth below, the charges for the initial examinations identified in Exhibit "1" also were fraudulent in that they misrepresented the nature, extent and results of the initial examinations.

**(i)    Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

104.    In the claims for initial examinations identified in Exhibit "1", Defendants routinely misrepresented the severity of the Insureds' presenting problems.

105.    Pursuant to the American Medical Association's CPT Assistant, which governs the proper use of CPT codes, the use of CPT codes 99203 and 99204 to bill for an initial patient examination represents that the Insured presented with problems of moderate severity (if billed under CPT code 99203) or moderate to high severity (if billed under CPT code 99204).

106.    However, to the extent that the Insureds in the claims identified in Exhibit "1" had any presenting problems at all as the result of their minor automobile accidents, the problems virtually always were low or minimal severity soft tissue injuries such as sprains and strains.

107.    For instance, in most of the claims identified in Exhibit "1", the Insureds did not seek treatment at any hospital as a result of their accident, and to the limited extent that the Insureds in the claims identified in Exhibit "1" did seek treatment at a hospital following their accident, they virtually always were briefly observed on an outpatient basis, and then discharged with nothing more serious than a minor soft tissue diagnosis.

108.    Furthermore, in most of the claims identified in Exhibit "1", contemporaneous police reports indicated that the Insureds' vehicles were functional following the accidents, and that no one was seriously injured their accidents, or injured at all.

109.    Even so, in the claims for initial examinations identified in Exhibit "1", Defendants billed for the examinations using CPT code 99204 and 99203, and thereby routinely falsely represented that the Insureds presented with problems of moderate to high severity.

110.    For example:

(i)    On October 26, 2021, an Insured named NL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that NL's vehicle was drivable following the accident. The police report further indicated that NL was not injured and did not complain of any pain at the scene.

In keeping with the fact that NL was not seriously injured, NL did not visit any hospital emergency room following the accident. To the extent that NL experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of NL on December 30, 2021, Alpha Medicine and Webster billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(ii)    On November 2, 2021, an Insured named BI was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that BI's vehicle was drivable following the accident. The police report further indicated that BI was not injured and did not complain of any pain at the scene. In keeping with the fact that BI was not seriously injured, BI did not visit any hospital emergency room following the accident. To the extent that BI experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of BI on December 13, 2021, Alpha Medicine and Webster billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(iii)    On December 3, 2021, an Insured named CY was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that CY's vehicle was drivable following the accident. The police report further indicated that CY was not injured and did not complain of any pain at the scene. In keeping with the fact that CY was not seriously injured, CY did not visit any hospital emergency room following the accident. To the extent that CY experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of CY on December 16, 2021, Alpha Medicine and Webster billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(iv)    On January 9, 2022, an Insured named WU was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that WU's vehicle was drivable following the accident. The police report further indicated that WU was not injured and did not complain of any pain at the scene. In keeping with the fact that WU was not seriously injured,

WU did not visit any hospital emergency room following the accident. To the extent that WU experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of WU on January 24, 2022, Alpha Medicine and Webster billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(v)     On February 18, 2022, an Insured named BD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that BD's vehicle was drivable following the accident. The police report further indicated that BD was not injured and did not complain of any pain at the scene. In keeping with the fact that BD was not seriously injured, BD did not visit any hospital emergency room following the accident. To the extent that BD experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of BD on February 22, 2022, Alpha Medicine and Webster billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(vi)    On March 7, 2022, an Insured named GA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that GA's vehicle was drivable following the accident. The police report further indicated that GA was not injured and did not complain of any pain at the scene. In keeping with the fact that GA was not seriously injured, GA did not visit any hospital emergency room following the accident. To the extent that GA experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of GA on March 11, 2022, Alpha Medicine and Webster billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(vii)   On July 9, 2022, an Insured name MR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MR's vehicle was drivable following the accident. The police report further indicated that MR was not injured and did not complain of any pain at the scene. In keeping with the fact that MR was not seriously injured, MR did not visit any hospital emergency room following the accident. To the extent that

MR experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of MR on July 21, 2022, Alpha Medicine and Webster billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(viii)   On June 28, 2023, an Insured named KL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that KL's vehicle was drivable following the accident. The police report further indicated that KL was not injured and did not complain of any pain at the scene. In keeping with the fact that KL was not seriously injured, KL did not visit any hospital emergency room following the accident. To the extent that KL experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of KL on July 11, 2023, Alpha Medicine and Mendoza billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(ix)    On August 13, 2023, an Insured named NT was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that NT's vehicle was drivable following the accident. The police report further indicated that NT was not injured and did not complain of any pain at the scene. In keeping with the fact that NT was not seriously injured, NT did not visit any hospital emergency room following the accident. To the extent that NT experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of NT on August 14, 2023, Alpha Medicine and Mendoza billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(x)    On September 1, 2023, an Insured named AG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AG's vehicle was drivable following the accident. The police report further indicated that AG was not injured and did not complain of any pain at the scene. In keeping with the fact that AG was not seriously injured, AG did not visit any hospital emergency room following the accident. To the extent that AG experienced any health problems at all as a result of the accident,

they were of low or minimal severity. Even so, following a purported initial examination of AG on September 5, 2023, Alpha Medicine and Mendoza billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xi)     On November 13, 2023, an Insured named TC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that TC's vehicle was drivable following the accident. The police report further indicated that TC was not injured and did not complain of any pain at the scene. In keeping with the fact that TC was not seriously injured, TC did not visit any hospital emergency room following the accident. To the extent that TC experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of TC on November 16, 2023, Alpha Medicine and Mendoza billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xii)    On February 20, 2024, an Insured named OD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that OD's vehicle was drivable following the accident. The police report further indicated that OD was not injured and did not complain of any pain at the scene. In keeping with the fact that OD was not seriously injured, OD did not visit any hospital emergency room following the accident. To the extent that OD experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of OD on February 21, 2024, Alpha Medicine and Mendoza billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xiii)   On March 26, 2024, an Insured named AM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AM's vehicle was drivable following the accident. The police report further indicated that AM was not injured and did not complain of any pain at the scene. In keeping with the fact that AM was not seriously injured, AM did not visit any hospital emergency room following the accident. To the extent that AM experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following

36

a purported initial examination of AM on April 2, 2024, Alpha Medicine and Mendoza billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xiv)  On April 9, 2024, an Insured named NI was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that NI's vehicle was drivable following the accident. The police report further indicated that NI was not injured and did not complain of any pain at the scene. In keeping with the fact that NI was not seriously injured, NI did not visit any hospital emergency room following the accident. To the extent that NI experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of NI on April 12, 2024, Alpha Medicine and Mendoza billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xv)  On April 17, 2024, an Insured named AS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AS's vehicle was drivable following the accident. The police report further indicated that AS was not injured and did not complain of any pain at the scene. In keeping with the fact that AS was not seriously injured, AS did not visit any hospital emergency room following the accident. To the extent that AS experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of AS on April 22, 2024, Alpha Medicine and Mendoza billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xvi)  On April 19, 2024, an Insured named RV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that RV's vehicle was drivable following the accident. The police report further indicated that RV was not injured and did not complain of any pain at the scene. In keeping with the fact that RV was not seriously injured, RV did not visit any hospital emergency room following the accident. To the extent that RV experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of RV on April 19, 2024, Alpha Medicine and Mendoza

billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xvii)  On May 17, 2024, an Insured named JY was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JY's vehicle was drivable following the accident. The police report further indicated that JY was not injured and did not complain of any pain at the scene. In keeping with the fact that JY was not seriously injured, JY did not visit any hospital emergency room following the accident. To the extent that JY experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of JY on May 24, 2024, Alpha Medicine and Mendoza billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xviii)  On June 7, 2024, an Insured named DD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that DD's vehicle was drivable following the accident. The police report further indicated that DD's vehicle was not injured and did not complain of any pain at the scene. In keeping with the fact that DD was not seriously injured, DD did not visit any hospital emergency room following the accident. To the extent that DD experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of DD on June 14, 2024, Alpha Medicine and Mendoza billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xix)  On June 13, 2024, an Insured named AA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AA's vehicle was drivable following the accident. The police report further indicated that AA was not injured and did not complain of any pain at the scene. In keeping with the fact that AA was not seriously injured, AA did not visit any hospital emergency room following the accident. To the extent that AA experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of AA on June 19, 2024, Alpha Medicine and Mendoza billed GEICO for the initial examination using CPT code

99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xx)    On July 11, 2024, an Insured named LL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that LL's vehicle was drivable following the accident. The police report further indicated that LL was not injured and did not complain of any pain at the scene. In keeping with the fact that LL was not seriously injured, LL did not visit any hospital emergency room following the accident. To the extent that LL experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of LL on July 18, 2024, Alpha Medicine and Mendoza billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

111.    These are only representative examples. In the claims for initial examinations identified in Exhibit "1", Defendants routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to: (i) create a false basis for their charges for the examinations under CPT codes 99204 and 99203, because examinations billable under CPT codes 99204 and 99203 are reimbursable at higher rates than examinations involving presenting problems of low severity, minimal severity, or no severity; and (ii) create a false basis for the other Fraudulent Services that Defendants purported to provide the Insureds.

112.    In this context, Mendoza and Webster, who at all relevant times purported to own Alpha Medicine did not – and could not have – legitimately supervised the business activities of Alpha Medicine.

113.    Had Mendoza and Webster legitimately supervised the business activities of Alpha Medicine, they would have ensured – among other things – that Alpha

Medicine's billing accurately represented the severity of the Insureds' presenting problems.

114. Mendoza and Webster failed to do so because they never legitimately supervised the business activities of Alpha Medicine.

**(ii)    Misrepresentations Regarding the Amount of Time Spent on Initial Examinations**

115. What is more, in the claims identified in Exhibit "1", the charges for the initial examinations under CPT codes 99204 and 99203 misrepresented and exaggerated the amount of face-to-face time that the examining practitioner spent with the Insured or the Insureds' families during the putative initial examinations.

116. Pursuant to the CPT Assistant, the use of CPT code 99204 to bill for a patient examination typically represents that the physician or other health care practitioner who conducted the underlying examination spent at least 45 minutes performing the examinations.

117. Moreover, pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination typically represents that the physician or other health care practitioner who conducted the underlying examination spent at least 30 minutes performing the examinations.

118. As set forth in Exhibit "1", Defendants typically billed for their putative initial examinations using CPT code 99204 and 99203, and thereby represented that the physicians or other health care practitioners who purported to perform the examinations spent at least 30-45 minutes of time performing the examinations.

119.   In fact, in the initial examinations identified in Exhibit "1", the physicians, advanced practice registered nurses, and other practitioners who purported to perform the initial examinations on behalf of Alpha Medicine never spent more than 15-20 minutes when conducting the examinations, much less 30 to 45 minutes.

120.   In keeping with the fact that the initial examinations in the claims identified in Exhibit "1" did not take more than 15-20 minutes to perform, the practitioners who purported to perform the examinations on behalf of Alpha Medicine used template forms in conducting the examinations.

121.   All that was required to complete the template forms was a brief patient interview and a perfunctory physical examination of the Insureds, using a limited range of examination parameters.

122.   These interviews and examinations did not require Mendoza, Webster, or any other health care practitioner associated with Alpha Medicine to spend more than 15-20 minutes performing the putative initial examinations.

123.   In the claims for initial examinations that are identified in Exhibit "1", Defendants routinely misrepresented the amount of time that was spent in conducting the initial examinations because lengthier examinations that are billable under CPT codes 99204 and 99203 are reimbursable at higher rates than examinations that take less time to perform.

**(iii)    Misrepresentations Regarding the Extent of Medical Decision-Making**

124.   Furthermore, and pursuant to the CPT Assistant, when Defendants billed GEICO for putative initial examinations under CPT code 99204 in the claims

41

for initial examinations identified in Exhibit "1", they falsely represented that the practitioners who purported to perform the examinations on behalf of Alpha Medicine engaged in some legitimate, moderate complexity medical decision-making in connection with the examinations.

125.    Moreover, pursuant to the CPT Assistant, when Defendants billed GEICO for putative initial examinations under CPT code 99203 in the claims for initial examinations identified in Exhibit "1", they falsely represented that the practitioners who purported to perform the examinations on behalf of Alpha Medicine engaged in some legitimate, low complexity medical decision-making in connection with the examinations.

126.    In actuality, the purported initial examinations at Alpha Medicine did not involve any legitimate medical decision-making at all.

127.    Rather, in the claims for initial examinations identified in Exhibit "1": (i) the initial examinations did not involve the retrieval, review, or analysis of any meaningful amount of medical records, diagnostic, tests, or other information; (ii) there was no risk of significant complications or morbidity – much less mortality – from the Insureds' minor soft-tissue injury complaints, to the extent that they ever had any complaints arising from automobile accidents at all; and (iii) the practitioners who purported to perform the examinations did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations, and instead provided a substantially similar, pre-determined sprain/strain or similar soft

tissue injury "diagnoses" for every Insured, regardless of their true individual circumstances or presentation.

128.  For example:

(i)  On November 2, 2021, an Insured named BI was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that BI's vehicle was drivable following the accident. The police report further indicated that BI was not injured and did not complain of any pain at the scene. In keeping with the fact that BI was not seriously injured, BI did not visit any hospital emergency room following the accident. To the extent that BI experienced any health problems at all as a result of the accident, they were of low or minimal severity. On December 13, 2021, Webster purported to conduct an initial examination of BI at Alpha Medicine. To the extent that Webster performed the examination in the first instance, Webster did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Instead, Webster provided BI with the same, false list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither BI's presenting problems, nor the treatment plan provided to BI by Webster and Alpha Medicine presented any risk of significant complications, morbidity, or mortality. To the contrary, BI did not need any significant treatment at all as a result of the accident, and the treatment provided by Webster and Alpha Medicine consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to BI. Even so, Webster and Alpha Medicine billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Webster engaged in some legitimate, moderate-complexity medical decision-making during the purported examination.

(ii)  On December 3, 2021, an Insured named CY was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that CY's vehicle was drivable following the accident. The police report further indicated that CY was not injured and did not complain of any pain at the scene. In keeping with the fact that CY was not seriously injured, CR did not visit any hospital emergency room following the accident. To the extent that CY experienced any health problems at all as a result of the accident, they were of low or minimal severity. On December 16, 2021, Webster purported to conduct an initial examination of CY at Alpha Medicine.

To the extent that Webster performed the examination in the first instance, Webster did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Instead, Webster provided CY with the same, false list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither CY's presenting problems, nor the treatment plan provided to CY by Webster and Alpha Medicine presented any risk of significant complications, morbidity, or mortality. To the contrary, CY did not need any significant treatment at all as a result of the accident, and the treatment provided by Webster and Alpha Medicine consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to CY. Even so, Webster and Alpha Medicine billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Webster engaged in some legitimate, moderate-complexity medical decision-making during the purported examination.

(iii)  On January 9, 2022, an Insured named WU was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that WU's vehicle was drivable following the accident. The police report further indicated that WU was not injured and did not complain of any pain at the scene. In keeping with the fact that WU was not seriously injured, WU did not visit any hospital emergency room following the accident. To the extent that WU experienced any health problems at all as a result of the accident, they were of low or minimal severity. On January 24, 2022, Webster purported to conduct an initial examination of WU at Alpha Medicine. To the extent that Webster performed the examination in the first instance, Webster did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Instead, Webster provided WU with the same, false list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither WU's presenting problems, nor the treatment plan provided to WU by Webster and Alpha Medicine presented any risk of significant complications, morbidity, or mortality. To the contrary, WU did not need any significant treatment at all as a result of the accident, and the treatment provided by Webster and Alpha Medicine consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to WU. Even so, Webster and Alpha Medicine billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Webster engaged in some legitimate, moderate-complexity medical decision-making during the purported examination.

(iv)     On July 9, 2022, an Insured name MR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MR's vehicle was drivable following the accident. The police report further indicated that MR was not injured and did not complain of any pain at the scene. In keeping with the fact that MR was not seriously injured, MR did not visit any hospital emergency room following the accident. To the extent that MR experienced any health problems at all as a result of the accident, they were of low or minimal severity. On July 21, 2022, Webster purported to conduct an initial examination of MR at Alpha Medicine. To the extent that Webster performed the examination in the first instance, Webster did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Instead, Webster provided MR with the same, false list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither MR's presenting problems, nor the treatment plan provided to MR by Webster and Alpha Medicine presented any risk of significant complications, morbidity, or mortality. To the contrary, MR did not need any significant treatment at all as a result of the accident, and the treatment provided by Webster and Alpha Medicine consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to MR. Even so, Webster and Alpha Medicine billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Webster engaged in some legitimate, low-complexity medical decision-making during the purported examination.

(v)     On June 28, 2023, an Insured named OV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision and that OV's vehicle was drivable following the accident. The police report further indicated that OV was not injured and did not complain of any pain at the scene. In keeping with the fact that OV was seriously injured, OV did not visit any hospital emergency room following the accident. To the extent that OV experienced any health problems at all as a result of the accident, they were of low or minimal severity. On July 11, 2023, Ibarra purported to conduct an initial examination of OV at Alpha Medicine. To the extent that Ibarra performed the initial examination in the first instance, Ibarra did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Instead, Ibarra provided OV with the same, false list of soft tissue injury "diagnoses" that she provided to virtually every other

Insured. Furthermore, neither OV's presenting problems, nor the treatment plan provided to OV by Ibarra and Alpha Medicine presented any risk of significant complications, morbidity, or mortality. To the contrary, OV did not need any significant treatment at all as a result of the accident, and the treatment provided by Ibarra and Alpha Medicine consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to OV. Even so, Mendoza and Alpha Medicine billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Ibarra engaged in some legitimate, moderate-complexity medical decision-making during the purported examination.

(vi)  On July 19, 2023, an Insured named VC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that VC's vehicle was drivable following the accident. The police report further indicated that VC was not injured and did not complain of any pain at the scene. In keeping with the fact that VC was not seriously injured, VC did not visit any hospital emergency room following the accident. To the extent that VC experienced any health problems at all as a result of the accident, they were of low or minimal severity. On July 28, 2023, Diaz purported to conduct an initial examination of VC at Alpha Medicine. To the extent that Diaz performed the initial examination in the first instance, Diaz did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Instead, Diaz provided VC with the same, false list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither VC's presenting problems, nor the treatment plan provided to VC by Diaz and Alpha Medicine presented any risk of significant complications, morbidity, or mortality. To the contrary, VC did not need any significant treatment at all as a result of the accident, and the treatment provided by Diaz and Alpha Medicine consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to VC. Even so, Mendoza and Alpha Medicine billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Diaz engaged in some legitimate, moderate-complexity medical decision-making during the purported examination.

(vii)  On November 13, 2023, an Insured named TC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that TC's vehicle was drivable following the accident. The police report further indicated

that TC was not injured and did not complain of any pain at the scene. In keeping with the fact that TC was not seriously injured, TC did not visit any hospital emergency room following the accident. To the extent that TC experienced any health problems at all as a result of the accident, they were of low or minimal severity. On November 16, 2023, Echevarria purported to conduct an initial examination of TC at Alpha Medicine. To the extent that Echevarria performed the initial examination in the first instance, Echevarria did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Instead, Echevarria provided TC with the same, false list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither TC's presenting problems, nor the treatment plan provided to TC by Echevarria and Alpha Medicine presented any risk of significant complications, morbidity, or mortality. To the contrary, TC did not need any significant treatment at all as a result of the accident, and the treatment provided by Echevarria and Alpha Medicine consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to TC. Even so, Mendoza and Alpha Medicine billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Echevarria engaged in some legitimate, moderate-complexity medical decision-making during the purported examination.

(viii)    On February 20, 2024, an Insured named OD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that OD's vehicle was drivable following the accident. The police report further indicated that OD was not injured and did not complain of any pain at the scene. In keeping with the fact that OD was not seriously injured, OD did not visit any hospital emergency room following the accident. To the extent that OD experienced any health problems at all as a result of the accident, they were of low or minimal severity. On February 21, 2024, Ibarra purported to conduct an initial examination of OD at Alpha Medicine. To the extent that Ibarra performed the initial examination in the first instance, Ibarra did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Instead, Ibarra provided OD with the same, false list of soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither OD's presenting problems, nor the treatment plan provided to OD by Ibarra and Alpha Medicine presented any risk of significant complications, morbidity, or mortality. To the contrary, OD did not need

any significant treatment at all as a result of the accident, and the treatment provided by Ibarra and Alpha Medicine consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to OD. Even so, Mendoza and Alpha Medicine billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Ibarra engaged in some legitimate, moderate-complexity medical decision-making during the purported examination.

(ix) On March 26, 2024, an Insured named AM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AM's vehicle was drivable following the accident. The police report further indicated that AM was not injured and did not complain of any pain at the scene. In keeping with the fact that AM was not seriously injured, AM did not visit any hospital emergency room following the accident. To the extent that AM experienced any health problems at all as a result of the accident, they were of low or minimal severity. On April 2, 2024, Diaz purported to conduct an initial examination of AM at Alpha Medicine. To the extent that Diaz performed the initial examination of AM in the first instance, Diaz did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Instead, Diaz provided AM with the same, false list of soft tissue injury "diagnoses" that he provide to virtually every other Insured. Furthermore, neither AM's presenting problems, nor the treatment plan provided to AM by Diaz and Alpha Medicine presented any risk of significant complications, morbidity, or mortality. To the contrary, AM did not need any significant treatment at all as a result of the accident, and the treatment provided by Diaz and Alpha Medicine consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to AM. Even so, Mendoza and Alpha Medicine billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Diaz engaged in some legitimate, moderate-complexity medical decision-making during the purported examination.

(x) On May 17, 2024, an Insured named JY was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JY's vehicle was drivable following the accident. The police report further indicated that JY was not injured and did not complain of any pain at the scene. In keeping with the fact that JY was not seriously injured, JY did not visit any hospital emergency room following the accident. To the extent that JY experienced any health problems at all as a result of the accident, they

were of low or minimal severity. On May 24, 2024, Gomez purported to conduct an initial examination of JY at Alpha Medicine. To the extent that Gomez performed the initial examination in the first instance, Gomez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Instead, Gomez provided JY with the same, false list of soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither JY's presenting problems, nor the treatment plan provided to JY by Gomez and Alpha Medicine presented any risk of significant complications, morbidity, or mortality. To the contrary, JY did not need any significant treatment at all as a result of the accident, and the treatment provided by Gomez and Alpha Medicine consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to JY. Even so, Mendoza and Alpha Medicine billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Gomez engaged in some legitimate, moderate-complexity medical decision-making during the purported examination.

(xi) On April 11, 2024, an Insured named AP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AP's vehicle was drivable following the accident. The police report further indicated that AP was not injured and did not complain of any pain at the scene. In keeping with the fact that AP was not seriously injured, AP did not visit any hospital emergency room following the accident. To the extent that AP experienced any health problems at all as a result of the accident, they were of low or minimal severity. On April 17, 2024, Philistin purported to conduct an initial examination of AP at Alpha Medicine. To the extent that Philistin performed the initial examination in the first instance, Philistin did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Instead, Philistin provided AP with the same, false list of soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither AP's presenting problems, nor the treatment plan provided to AP by Philistin and Alpha Medicine presented any risk of significant complications, morbidity, or mortality. To the contrary, AP did not need any significant treatment at all as a result of the accident, and the treatment provided by Philistin and Alpha Medicine consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to AP. Even so, Mendoza and Alpha Medicine billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Philistin engaged in

some legitimate, moderate-complexity medical decision-making during the purported examination.

(xii)  On April 17, 2024, an Insured named AS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AS's vehicle was drivable following the accident. The police report further indicated that AS was not injured and did not complain of any pain at the scene. In keeping with the fact that AS was not seriously injured, AS did not visit any hospital emergency room following the accident. To the extent that AS experienced any health problems at all as a result of the accident, they were of low or minimal severity. On April 22, 2024, Muniz purported to conduct an initial examination of AS at Alpha Medicine. To the extent that Muniz performed the initial examination in the first instance, Muniz did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Instead, Muniz provided AS with the same, false list of soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither AS's presenting problems, nor the treatment plan provided to AS by Muniz and Alpha Medicine presented any risk of significant complications, morbidity, or mortality. To the contrary, AS did not need any significant treatment at all as a result of the accident, and the treatment provided by Muniz and Alpha Medicine consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to AS. Even so, Mendoza and Alpha Medicine billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Muniz engaged in some legitimate, moderate-complexity medical decision-making during the purported examination.

(xiii)  On June 7, 2024, an Insured named DD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that DD's vehicle was drivable following the accident. The police report further indicated that DD was not injured and did not complain of any pain at the scene. In keeping with the fact that DD was not seriously injured, DD did not visit any hospital emergency room following the accident. To the extent that DD experienced any health problems at all as a result of the accident, they were of low or minimal severity. On June 14, 2024, Diaz purported to conduct an initial examination of DD at Alpha Medicine. To the extent that Diaz performed the initial examination in the first instance, Diaz did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with

the examination. Instead, Diaz provided DD with the same, false list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither DD's presenting problems, nor the treatment plan provided to DD by Diaz and Alpha Medicine presented any risk of significant complications, morbidity, or mortality. To the contrary, DD did not need any significant treatment at all as a result of the accident, and the treatment provided by Diaz and Alpha Medicine consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to DD. Even so, Mendoza and Alpha Medicine billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Diaz engaged in some legitimate, moderate-complexity medical decision-making during the purported examination.

(xiv)   On June 13, 2024, an Insured named AA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AA's vehicle was drivable following the accident. The police report further indicated that AA was not injured and did not complain of any pain at the scene. In keeping with the fact that AA was not seriously injured, AA did not visit any hospital emergency room following the accident. To the extent that AA experienced any health problems at all as a result of the accident, they were of low or minimal severity. On June 19, 2024, Diaz purported to conduct an initial examination of AA at Alpha Medicine. To the extent that Diaz performed the initial examination in the first instance, Diaz did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Instead, Diaz provided AA with the same, false list of soft tissue injury "diagnoses" that he proved to virtually every other Insured. Furthermore, neither AA's presenting problems, nor the treatment plan provided to AA by Diaz and Alpha Medicine presented any risk of significant complications, morbidity, or mortality. To the contrary, AA did not need any significant treatment at all as a result of the accident, and the treatment provided by Diaz and Alpha Medicine consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to AA. Even so, Mendoza and Alpha Medicine billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Diaz engaged in some legitimate, moderate-complexity medical decision-making during the purported examination.

(xv)   On July 11, 2024, an Insured named LL was involved in an automobile accident. The contemporaneous police report indicated that the accident

was a low-speed, low-impact collision, and that LL's vehicle was drivable following the accident. The police report further indicated that LL was not injured and did not complain of any pain at the scene. In keeping with the fact that LL was not seriously injured, LL did not visit any hospital emergency room following the accident. To the extent that LL experienced any health problems at all as a result of the accident, they were of low or minimal severity. On July 18, 2024, Philistin purported to conduct an initial examination of LL at Alpha Medicine. To the extent that Philistin performed the initial examination in the first instance, Philistin did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Instead, Philistin provided LL with the same, false list of soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither LL's presenting problems, nor the treatment plan provided to LL by Philistin and Alpha Medicine presented any risk of significant risk of complications, morbidity, or mortality. To the contrary, LL did not need any significant treatment at all as a result of the accident, and the treatment provided by Philistin and Alpha Medicine consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to LL. Even so, Mendoza and Alpha Medicine billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Philistin engaged in some legitimate, moderate-complexity medical decision-making during the purported examination.

129.    These are only representative examples. In the claims identified in Exhibit "1", Defendants routinely falsely represented that the purported examinations involved legitimate low-complexity or moderate-complexity medical decision-making, when in fact they did not involve any legitimate medical decision-making.

130.    In a legitimate clinical setting, when a patient presents with a soft tissue injury such as a sprain or strain arising from an automobile accident, the initial standard of care is conservative treatment comprise of rest, ice, compression, and – if applicable – elevation of the affected body part.

52

131.   It is generally inappropriate to begin administering physical therapy to a patient with a soft tissue injury in the immediate aftermath of the injury, before the patient has first tried a more conservative course of rest, ice, compression, and – if applicable – elevation of the affected body part.

132.   Even so, in the claims identified in Exhibit "1", Defendants routinely caused Insureds to immediately begin a course of physical therapy often within days of their accidents, before the Insureds had first tried a more conservative course of treatment.

133.   Defendants routinely directed Insureds to immediately begin a course of physical therapy within days of their accidents, or even on the same day of their accidents, because their putative initial examinations involved no legitimate medical decision-making, and had pre-determined outcomes.

134.   There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

135.   An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

136.   As set forth herein, in the claims identified in Exhibit "1", virtually all of the Insureds whom Defendants purported to treat were involved in relatively minor accidents.

137.   It is improbable that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibit "1" would suffer

substantially similar injuries as the result of their accidents, or require a substantially similar course of treatment.

138.   It is even more improbable – to the point of impossibility – that this kind of pattern would recur with great frequency within the cohort of patients treating at Alpha Medicine, with numerous instances in which two or more patients who had been involved in the same accident supposedly presented with substantially similar symptoms warranting substantially similar diagnoses and treatment.

139.   Even so, in keeping with the fact that their putative "diagnoses" and treatment recommendations were pre-determined and falsified, Defendants frequently provided examinations, on or about the same date, to two or more Insureds who had been involved in the same underlying accident, and at the conclusion of the examinations, caused the Insureds to be issued substantially similar identical, false "diagnoses", and recommended substantially identical courses of medically unnecessary "treatment" for the Insureds, despite the fact that they were differently situated.

140.   For example:

(i)     On February 20, 2022, two Insureds – AB and AC – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Alpha Medicine for initial examinations by Webster on the exact same date, March 8, 2022. At the conclusion of the purported initial examinations, Alpha Medicine and Webster provided AB and AC with substantially similar, false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(ii)    On March 7, 2022, two Insureds – WC and GA – were involved in the same automobile accident. Thereafter – incredibly – both Insureds

presented at Alpha Medicine for initial examinations by Webster <u>on the exact same date</u>, March 11, 2022. At the conclusion of the purported initial examinations, Alpha Medicine and Webster provided WC and GA with substantially similar, false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(iii)  On April 22, 2022, two Insureds – MR and GS – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Alpha Medicine for initial examinations by Webster <u>on the exact same date</u>, April 28, 2022. At the conclusion of the purported initial examinations, Alpha Medicine and Webster provided MR and GS with substantially similar, false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(iv)  On June 2, 2022, two Insureds – JH and KH – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Alpha Medicine for initial examinations by Rosales <u>on the exact same date</u>, June 3, 2022. At the conclusion of the purported initial examinations, Alpha Medicine, Webster, and Rosales provided JH and KH with substantially similar, false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(v)   On August 26, 2022, two Insureds – SL and LF – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Alpha Medicine for initial examinations by Gomez <u>on the exact same date</u>, October 20, 2022. At the conclusion of the purported initial examinations, Alpha Medicine, Mendoza, and Gomez provided SL and LF with substantially similar, false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(vi)  On May 16, 2023, two Insureds – YB and WN – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Alpha Medicine for initial examinations by Rosales <u>on the exact same date</u>, May 19, 2023. At the conclusion of the purported initial examinations, Alpha Medicine, Mendoza, and Rosales provided YB and WN with substantially similar, false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(vii)  On May 25, 2023, two Insureds – DR and KD – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Alpha Medicine for initial examinations by Ibarra on the exact same date, May 26, 2023. At the conclusion of the purported initial examinations, Alpha Medicine, Mendoza, and Ibarra provided DR and KD with substantially similar, false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(viii)  On July 19, 2023, two Insureds – JO and RS – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Alpha Medicine for initial examinations by Rosales on the exact same date, July 25, 2023. At the conclusion of the purported initial examinations, Alpha Medicine, Mendoza, and Rosales provided JO and RS with substantially similar, false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(ix)  On December 26, 2023, three Insureds – EP, MF, and MD – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Alpha Medicine for initial examinations by Echevarria on the exact same date, December 26, 2023. At the conclusion of the purported initial examinations, Alpha Medicine. Mendoza, and Echevarria provided EP, MF, and MD with substantially similar, false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to all of them.

(x)  On January 29, 2024, two Insureds – JP and VG – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Alpha Medicine for initial examinations by Gomez on the exact same date, February 2, 2024. At the conclusion of the purported initial examinations, Alpha Medicine, Mendoza, and Gomez provided JP and VG with substantially similar, false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xi)  On March 11, 2024, two Insureds – MK and TK – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Alpha Medicine for initial examinations by Ibarra on the exact same date, March 19, 2024. At the conclusion of the purported initial examinations, Alpha Medicine, Mendoza, and Ibarra provided MK and TK with substantially similar, false soft tissue injury

56

"diagnoses" and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xii)   On March 26, 2024, <u>four</u> Insureds – LS, LS, NM, and MM – were involved in the same automobile accident. Thereafter – incredibly – all four Insureds presented at Alpha Medicine for initial examinations by Ibarra <u>on the exact same date</u>, April 8, 2024. At the conclusion of the purported initial examinations, Alpha Medicine, Mendoza, and Ibarra provided LS, LS, NM, and MM with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to all of them.

(xiii)  On April 4, 2024, two Insureds – JR and JB – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Alpha Medicine for initial examinations by Gomez <u>on the exact same date</u>, April 19, 2024. At the conclusion of the purported initial examinations, Alpha Medicine, Mendoza, and Gomez provided JR and JB with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xiv)   On May 11, 2024, two Insureds – MM and CM – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Alpha Medicine for initial examinations by Rosales <u>on the exact same date</u>, June 7, 2024. At the conclusion of the purported initial examinations, Alpha Medicine, Mendoza, and Rosales provided MM and CM with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xv)    On June 4, 2024, two Insureds – MA and IV – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Alpha Medicine for initial examinations by Ibarra <u>on the exact same date</u>, June 6, 2024. At the conclusion of the purported initial examinations, Alpha Medicine, Mendoza, and Ibarra provided MA and IV with substantially similar, false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

141.   These are only representative examples. In the claims for initial examinations identified in Exhibit "1", Defendants routinely falsely represented that

the putative examinations involved legitimate, moderate or low-complexity medical decision making in order to create a false basis to bill for the initial examinations under CPT codes 99204 and 99203, because examinations billable under CPT codes 99204 and 99203 are reimbursable at a higher rate than examinations that do not require any complex medical decision-making at all.

142.    In actuality, the initial examinations did not involve any legitimate medical decision-making at all, because the purported "results" of the examinations were pre-determined, falsified, and designed to provide a false justification for the laundry-list of other Fraudulent Services that Defendants purported to provide.

143.    In the claims for initial examinations identified in Exhibit "1", Defendants routinely fraudulently misrepresented that the examinations were lawfully provided and eligible for PIP reimbursement, when in fact they were neither lawfully provided nor reimbursable because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially identical, false "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)    the charges for the putative examinations misrepresented the nature, extent, and results of the examinations; and

(iii)   Alpha Medicine was never eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as they were operated in violation of Florida Law.

144.    In this context, Mendoza and Webster, who at all relevant times purported to own Alpha Medicine, did not – and could not have – legitimately supervised the business activities of Alpha Medicine.

58

145.    Had Mendoza and Webster legitimately supervised the business activities of Alpha Medicine, they would have noted – among other things – that Alpha Medicine's billing routinely falsely misrepresented that the putative initial examinations were legitimately and lawfully performed.

146.    Mendoza and Webster failed to do so because they never legitimately supervised the business activities of Alpha Medicine.

## 2.    The Fraudulent and Unlawful Charges for Follow-Up Examinations at Alpha Medicine

147.    In addition to their fraudulent initial examinations, Defendants purported to provide most of the Insureds in the claims identified in Exhibit "1" with multiple, fraudulent follow-up examinations during the course of their fraudulent treatment and billing protocol.

148.    In the claims identified in Exhibit "1", the follow-up examinations – which were usually performed by Mendoza, Webster, or other healthcare practitioners associated with Alpha Medicine – were billed to GEICO under (i) CPT code 99214, typically resulting in a charge between $487.50 and $872.79 for each putative examination; or (ii) CPT code 99213, typically resulting in a charge between $393.00 and $730.00 for each putative examination.

149.    In the claims for follow-up examinations identified in Exhibit "1", the charges for the follow-up examinations were fraudulent in that they misrepresented Alpha Medicine's eligibility to collect PIP Benefits in the first instance.

150.    In fact, and as set forth herein, Alpha Medicine was never eligible to collect PIP Benefits, inasmuch as it was operated in violation of Florida law.

151.    As set forth below, Defendants' charges for the follow-up examinations identified in Exhibit "1" also were fraudulent in that they misrepresented the nature, extent, and results of the purported follow-up examinations.

**(i)    Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

152.    Pursuant to the CPT Assistant, the use of CPT code 99214 to bill for a follow-up examination represented – among other things – that the patient presented with problems of moderate to high severity at the time of the examination.

153.    Moreover, pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up examination represented – among other things – that the patient presented with problems of low to moderate severity at the time of the examination.

154.    However, to the extent that the Insureds in the claims identified in Exhibit "1" suffered any injuries at all in their automobile accidents, the injuries were almost always minor soft tissue injuries such as sprains and strains, which were of low or minimal severity, even at their onset.

155.    Minor soft tissue injuries such as strains and sprains virtually always resolve after a short course of conservative treatment or no treatment at all. By the time the Insureds in the claims identified in Exhibit "1" presented for their putative follow-up examinations – typically weeks or months after their minor accidents – the Insureds

either did not have any genuine presenting problems at all as a result of their minor automobile accidents, or else their presenting problems were minimal.

156.    Even so, in the claims for follow-up examinations under CPT code 99214 and 99213 identified in Exhibit "1", Defendants represented that the Insureds presented with problems of low to moderate or moderate to high severity, when in fact the Insureds' problems were minimal severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all at the time of the purported examinations.

157.    For example:

(i)    On November 2, 2021, an Insured named BI was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that BI's vehicle was drivable following the accident. The police report further indicated that BI was not injured and did not complain of any pain at the scene. In keeping with the fact that BI was not seriously injured, BI did not visit any hospital emergency room following the accident. To the extent that BI experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and had completely resolved or were minimal within 2-3 weeks of the accident. Even so, following a purported follow-up examination by Webster on January 17, 2022, Alpha Medicine and Webster billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that BI presented with problems of moderate to high severity during the examination.

(ii)    On February 6, 2022, an Insured named PV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that PV's vehicle was drivable following the accident. The police report further indicated that PV was not injured and did not complain of any pain at the scene. In keeping with the fact that PV was not seriously injured, PV did not visit any hospital emergency room following the accident. To the extent that PV experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and had

completely resolved or were minimal within 2-3 weeks of the accident. Even so, following a purported initial examination by Webster on May 24, 2022, Alpha Medicine and Webster billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that PV presented with problems of moderate to high severity during the examination.

(iii)    On February 18, 2022, an Insured named BD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that BD's vehicle was drivable following the accident. The police report further indicated that BD was not injured and did not complain of any pain at the scene. In keeping with the fact that BD was not seriously injured, BD did not visit any hospital emergency room following the accident. To the extent that BD experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and had completely resolved or were minimal within 2-3 weeks of the accident. Even so, following a purported follow-up examination by Webster on June 17, 2022, Alpha Medicine and Webster billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely that BD presented with problems of low to moderate severity during the examination.

(iv)    On March 7, 2022, an Insured named GA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that GA's vehicle was drivable following the accident. The police report further indicated that GA was not injured and did not complain of any pain at the scene. In keeping with the fact that GA was not seriously injured, GA did not visit any hospital emergency room following the accident. To the extent that GA experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and had completely resolved or were minimal within 2-3 weeks of the accident. Even so, following a purported follow-up examination by Webster on March 11, 2022, Alpha Medicine and Webster billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely that GA presented with problems of low to moderate severity during the examination.

(v)    On March 11, 2022, an Insured named TN was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that TN's vehicle was drivable following the accident. The police report further indicated

that TN was not injured and did not complain of any pain at the scene. In keeping with the fact that TN was not seriously injured, TN did not visit any hospital emergency room following the accident. To the extent that TN experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and had completely resolved or were minimal within 2-3 weeks of the accident. Even so, following a purported follow-up examination of TN by Mendoza on July 27, 2022, Alpha Medicine and Webster billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that TN presented with problems of moderate to high severity during the examination.

(vi)    On July 9, 2022, an Insured named MR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MR's vehicle was drivable following the accident. The police report further indicated that MR was not injured and did not complain of any pain at the scene. In keeping with the fact that MR was not seriously injured, MR did not visit any hospital emergency room following the accident. To the extent that MR experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and had completely resolved or were minimal within 2-3 weeks of the accident. Even so, following a purported follow-up examination by Gomez on July 21, 2022, Alpha Medicine and Webster billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that MR presented with problems of low to moderate severity.

(vii)    On June 28, 2023, an Insured named KL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that KL's vehicle was drivable following the accident. The police report further indicated that KL was not injured and did not complain of any pain at the scene. In keeping with the fact that KL was not seriously injured, KL did not visit any hospital emergency room following the accident. To the extent that KL experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and had completely resolved or were minimal within 2-3 weeks of the accident. Even so, following a purported follow-up examination by Ibarra on July 19, 2023, Alpha Medicine and Mendoza billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that KL presented with problems of low to moderate severity during the examination.

(viii)   On June 28, 2023, an Insured named OV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that OV's vehicle was drivable following the accident. The police further indicated that OV was not injured and did not complain of any pain at the scene. In keeping with the fact that OV was not seriously injured, OV did not visit any hospital emergency room following the accident. To the extent that OV experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and had completely resolved or were minimal within 2-3 weeks of the accident. Even so, following a purported follow-up examination of OV by Murrillo on September 22, 2023, Alpha Medicine and Mendoza billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented OV presented with problems of low to moderate severity during the examination.

(ix)   On August 13, 2023, an Insured named NT was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that NT's vehicle was drivable following the accident. The police report further indicated that NT was not injured and did not complain of any pain at the scene. In keeping with the fact that NT was not seriously injured, NT did not visit any hospital emergency room following the accident. To the extent that NT experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and had completely resolved or were minimal within 2-3 weeks of the accident. Even so, following a purported follow-up examination by Diaz on November 29, 2023, Alpha Medicine and Mendoza billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented NT presented with problems of low to moderate severity during the examination.

(x)   On September 1, 2023, an Insured named AG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AG's vehicle was drivable following the accident. The police report further indicated that AG was not injured and did not complain of any pain at the scene. In keeping with the fact that AG was not seriously injured, AG did not visit any hospital emergency room following the accident. To the extent that AG experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and improved or were minimal within 2-3 weeks of the accident. Even so, following a purported follow-up examination by Mendoza on November 21, 2023,

Alpha Medicine and Mendoza billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that AG presented with problems of low to moderate severity during the examination.

(xi)    On November 13, 2023, an Insured named TC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that TC's vehicle was drivable following the accident. The police report further indicated that TC was not injured and did not complain of any pain at the scene. In keeping with the fact that TC was not seriously injured, TC did not visit any hospital emergency room following the accident. To the extent that TC experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and improved or were minimal within 2-3 weeks of the accident. Even so, following a purported follow-up examination by Diaz on December 8, 2023, Alpha Medicine and Mendoza billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that TC presented with problems of low to moderate severity during the examination.

(xii)   On February 20, 2024, an Insured named OD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that OD's vehicle was drivable following the accident. The police report further indicated that OD was not injured and did not complain of any pain at the scene. In keeping with the fact that OD was not seriously injured, OD did not visit any hospital emergency room following the accident. To the extent that OD experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and improved or were minimal within 2-3 weeks of the accident. Even so, following a purported follow-up examination by Muniz on May 2, 2024, Alpha Medicine and Mendoza billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that OD presented with problems of moderate to high severity during the examination.

(xiii)  On May 17, 2024, an Insured named JY was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JY's vehicle was drivable following the accident. The police report further indicated that JY was not injured and did not complain of any pain at the scene. In keeping with the fact that JY was not seriously injured, JY did not visit any hospital emergency room following the accident. To the extent that JY

experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and were improved or were minimal within 2-3 weeks of the accident. Even so, following a purported follow-up examination by Gomez on August 14, 2024, Alpha Medicine and Mendoza billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that that JY presented with problems of low to moderate severity during the examination.

(xiv)  On June 13, 2024, an Insured named AA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AA's vehicle was drivable following the accident. The police report further indicated that AA was not injured and did not complain of any pain at the scene. In keeping with the fact that AA was not seriously injured, AA did not visit any hospital emergency room following the accident. To the extent that AA experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and improved or were minimal within 2-3 weeks of the accident. Even so, following a purported follow-up examination by Diaz on August 23, 2024, Alpha Medicine and Mendoza billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that AA presented with problems of low to moderate severity during the examination.

(xv)  On July 11, 2024, an Insured named LL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that LL's vehicle was drivable following the accident. The police report further indicated that LL was not injured and did not complain of any pain at the scene. In keeping with the fact that LL was not seriously injured, LL did not visit any hospital emergency room following the accident. To the extent that LL experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and had improved or were minimal within 2-3 weeks of the accident. Even so, following a purported follow-up examination by Philistin on July 25, 2024, Alpha Medicine and Mendoza billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that LL presented with problems of low to moderate severity during the examination.

158.  These are only representative examples. In the claims for follow-up examinations identified in Exhibit "1", Defendants routinely falsely represented that

the Insureds presented with problems of low to moderate or moderate to high severity in order to create a false basis for their charges for initial examinations under CPT codes 99214 and 99213, because follow-up examinations billable under CPT codes 99214 and 99213 are reimbursable at higher rates than examinations involving presenting problems of minimal severity or no severity.

159.    In the claims for follow-up examinations identified in Exhibit "1", Defendants routinely falsely represented that the Insureds presented with problems of either low to moderate severity or moderate to high severity in order to create a false basis for the other Fraudulent Services that Defendants purported to provide to the Insureds.

**(ii)    Misrepresentations Regarding the Nature, Extent, and Results of the Follow-Up Examinations**

160.    Pursuant to the CPT Assistant, the use of CPT code 99214 to bill for a follow-up examination represents that the examining practitioner performed at least two of the following three components: (i) took a "detailed" patient history; (ii) conducted a "detailed" physical examination; and (iii) engaged in medical decision making of "moderate complexity".

161.    Pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up examination represents that the examining practitioner performed at least two of the following three components: (i) took an "expanded problem focused" patient history; (ii) conducted an "expanded problem focused" physical examination; and (iii) engaged in medical decision-making of "low complexity".

162. Though Defendants routinely billed the purported follow-up examinations using CPT codes 99214 or 99213, neither Mendoza, Webster, nor other practitioner associated with Alpha Medicine took any legitimate patient histories, conducted any legitimate physical examinations, or engaged in any legitimate medical decision-making at all.

163. Rather, following the purported follow-up examinations, Defendants – and other practitioners at Alpha Medicine working at their direction – simply: (i) reiterated the false, boilerplate "diagnoses" from the Insureds' initial examinations, and either (ii) referred the Insureds for even more medically unnecessary Fraudulent Services, often including physical therapy services, despite the fact that the Insureds purportedly already had received extensive physical therapy services that supposedly had not been successful in resolving their purported pain symptoms; or (iii) discharged the Insureds from "treatment", to the extent that their PIP Benefits had been exhausted.

164. The putative "follow-up examinations" that Defendants purported to provide the Insureds in the claims identified in Exhibit "1" therefore were medically useless, and played no legitimate role in the treatment or care of the Insureds, because the putative "results" of the examinations were pre-determined for each Insured from the moment they walked into Defendants' offices.

165. In the claims for initial examinations identified in Exhibit "1", Defendants routinely fraudulently misrepresented that the follow-up examinations

were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative follow-up examinations were illusory, with outcomes that were pre-determined to result in substantially similar, false "diagnoses", and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)    the charges for the putative follow-up examinations misrepresented the nature and extent of the examinations; and

(iv)    Alpha Medicine never was eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as it operated in violation of Florida law.

166.    In this context, Mendoza and Webster – who at all relevant times purported to be the owners of Alpha Medicine – did not, and could not have, legitimately supervised the business activities of Alpha Medicine.

167.    Had Mendoza and Webster actually supervised the business activities of Alpha Medicine, Mendoza and Webster would have noted – among other things – that Alpha Medicine's billing falsely represented that the putative follow-up examinations were legitimately and lawfully performed.

**3.    The Fraudulent Charges for Physical Therapy Services at Alpha Medicine**

168.    In addition to the fraudulent initial and follow-up examinations, Defendants almost always purported to subject each of the Insureds in the claims identified in Exhibit "1" to months of medically unnecessary physical therapy services.

169.    As set forth in Exhibit "1", Defendants then billed the purported physical therapy services to GEICO under various physical therapy CPT codes, including:

(i)     CPT code 97110, for putative therapeutic exercises, typically ranging in charges from $90.00 to $240.00 for each round of therapeutic exercises they purported to provide;

(ii)    CPT code 97530, for putative therapeutic exercises, typically ranging in charges from $117.00 to $312.00 for each round of therapeutic exercises they purported to provide;

(iii)   CPT code 97112, for putative neuromuscular reeducation, typically ranging in charges from $105.00 and $280.00 for each round of neuromuscular reeducation they purported to provide;

(iv)    CPT code 97140, for putative manual therapy, typically ranging in charges from $83.63 and $223.00 for each round of manual therapy they purported to provide;

(v)     CPT code G0283, for putative electrical stimulation therapy, typically resulting in charges from $37.50 and $100.00 for each round of electrical stimulation therapy they purported to provide;

(vi)    CPT code 97010, for putative hot/cold pack application, typically ranging in charges from $7.50 to $37.14 for each round of therapeutic exercises they purported to provide.

170.   In a legitimate clinical setting, the individual physical therapy services that are provided to an individual patient should be tailored to that patient's individual circumstances and presentation.

171.   By contrast, at Alpha Medicine, the nature and extent of the physical therapy that each Insured purportedly received was pre-determined, and had no legitimate connection to the Insureds' individual circumstances, presentation, or progress through Defendants' fraudulent treatment and billing protocol.

172.   In addition, Defendants falsely represented that the therapy services lawfully had been performed or directly supervised by Mendoza, Webster, Trono, and other healthcare practitioners associated with Alpha Medicine, when in fact they were

unlawfully performed by massage therapists and unsupervised physical therapist assistants.

173. In the claims for physical therapy services identified in Exhibit "1", Defendants routinely fraudulently misrepresented that the services were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the services were medically unnecessary, and were provided without regard for the Insureds' true individual circumstances and presentation;

(ii)    the services were performed – to the extent that they were performed at all – by massage therapists and unsupervised physical therapist assistants;

(iii)   the billing for the services misrepresented the identities of the actual treating practitioners; and

(iv)    the Defendants never were eligible to collect PIP Benefits in connection with the services in the first instance, inasmuch as they unlawfully operated in violation of Florida law.

### III.   The Fraudulent Claims the Defendants Submitted or Caused to be Submitted to GEICO

174. To support their fraudulent charges, Defendants systematically submitted or caused to be submitted thousands of HCFA-1500 forms and treatment reports through Alpha Medicine to GEICO, containing thousands of individual charges, seeking payment for the Fraudulent Services for which Defendants were not entitled to receive payment.

175. The claims that Defendants submitted or caused to be submitted to GEICO were false and misleading in the following, material respects:

(i)    The HCFA-1500 forms and treatment reports submitted or caused to be submitted by Defendants misrepresented to GEICO that they were in compliance with Florida law and eligible to collect PIP Benefits in the first instance. In fact, Defendants never were in compliance with Florida law, and never were eligible to collect PIP Benefits.

(ii)   The HCFA-1500 forms and treatment reports or caused to be submitted by Defendants misrepresented to GEICO that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement. In fact, the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement.

(iii)  The HCFA-1500 forms and treatment reports submitted or caused to be submitted by Defendants misrepresented to GEICO that the Fraudulent Services were medically necessary, and in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, the Fraudulent Services frequently were not performed at all and, to the extent that they were performed, they were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich Defendants, not to benefit the Insureds who supposedly were subjected to them.

(iv)   The HCFA-1500 forms and treatment reports submitted by and on behalf of Defendants misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided, in order to increase the amount of reimbursement Defendants could unlawfully obtain.

## IV.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

176.   Defendants were legally and ethically obligated to act honestly and with integrity in connection with their performance of the Fraudulent Services and their submission of charges to GEICO.

177.   To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, Defendants systematically concealed their fraud and have gone to great lengths to accomplish this concealment.

178. For instance, Defendants knowingly misrepresented and concealed facts in an effort to prevent discovery that Defendants operated in violation of Florida law and therefore were ineligible to collect PIP Benefits int the first instance

179. Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary, and frequently never were performed in the first instance.

180. Defendants also knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that they unlawfully billed for services performed by massage therapists and unsupervised physical therapist assistants.

181. Defendants have hired law firms to pursue collection of the fraudulent charges for the Fraudulent Services from GEICO and other insurers.

182. GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and acts of concealment described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $1,690,000.00.

183. Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## FIRST CAUSE OF ACTION
### Against Alpha Medicine
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

184.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-183, above.

185.   There is an actual case in controversy between GEICO and Alpha Medicine regarding more than $75,000.00 in pending fraudulent claims for the Fraudulent Services that have been submitted to GEICO.

186.   Alpha Medicine has no right to receive payment for any pending bills submitted to GEICO because it unlawfully was operated in violation of Florida law.

187.   Alpha Medicine has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not lawfully provided or billed to GEICO.

188.   Alpha Medicine has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

189.   Alpha Medicine has no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services never were provided in the first instance.

190.    Alpha Medicine has no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

191.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Alpha Medicine has no right to receive payment for any pending bills submitted to GEICO.

**SECOND CAUSE OF ACTION**
**Against Webster and Mendoza**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

192.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-183, above.

193.    Alpha Medicine is an ongoing "enterprise," as that term is defined in 19 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

194.    Mendoza and Webster knowingly have conducted and/or participated, directly or indirectly, in the conduct of Alpha Medicine's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that Alpha Medicine was not eligible to receive under the No-Fault Law because: (i) Alpha Medicine unlawfully was operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and

were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to the Fraudulent Services; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the levels of services that purportedly were provided, in order to inflate the charges submitted to GEICO. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the charts annexed hereto as Exhibit "1".

195.    Alpha Medicine's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Mendoza and Webster operated Alpha Medicine, inasmuch as Alpha Medicine was not engaged in legitimate health care practice, and acts of mail fraud therefore were essential in order for Alpha Medicine to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Alpha Medicine continues to attempt collection on the fraudulent billing submitted through Alpha Medicine to the present day.

196.    Alpha Medicine is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Alpha Medicine in

pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

197.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,690,000.00 pursuant to the fraudulent bills submitted through Alpha Medicine.

198.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**THIRD CAUSE OF ACTION**
**Against Mendoza and Webster**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

199.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-183, above.

200.    Alpha Medicine is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

201.    Mendoza and Webster – together with Trono, among others – knowingly agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Alpha Medicine's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that Alpha Medicine was not entitled to receive under the No-Fault Laws because: (i) Alpha Medicine was unlawfully operated in violation of Florida law; (ii)

the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to the Fraudulent Services; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the levels of services that purportedly were provided, in order to inflate the charges submitted to GEICO. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the charts annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the fraudulent and unlawful scheme.

202.   Mendoza and Webster knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

203.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,690,000.00 pursuant to the fraudulent bills submitted through the Alpha Medicine enterprise.

204.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## FOURTH CAUSE OF ACTION
### Against Alpha Medicine, Webster, and Mendoza
### (Under Fla. Stat. 501.201 et. seq.)

205.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-183, above.

206.    Alpha Medicine, Webster, and Mendoza are actively engaged in trade and commerce in the State of Florida.

207.    GEICO and its Insureds are "consumers" are defined by Fla. Stat. 501.203.

208.    Alpha Medicine, Webster, and Mendoza engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

209.    The bills and supporting documents submitted or caused to be submitted by Alpha Medicine, Webster, and Mendoza to GEICO were fraudulent int hat the misrepresented: (i) Alpha Medicine's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

210.    Such acts and practices offend public police and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of Alpha Medicine, Webster, and Mendoza has been materially injurious to GEICO and its Insureds.

211.    The conduct of Alpha Medicine, Webster, and Mendoza was the actual and proximate cause of the damages sustained by GEICO.

212.    Alpha Medicine, Webster, and Mendoza's unfair and deceptive acts have caused GEICO to sustain damages of at least $1,690,000.00.

213.    By reason of Alpha Medicine, Webster, and Mendoza's conduct, GEICO is entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

**FIFTH CAUSE OF ACTION**
**Against Alpha Medicine, Webster, and Mendoza**
**(Common Law Fraud)**

214.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-183, above.

215.    Alpha Medicine, Webster, and Mendoza intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills through Alpha Medicine for the Fraudulent Services.

216.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Alpha Medicine was in compliance with Florida law and was eligible to collect PIP Benefits in the first instance, when in fact it was not; (ii) in every claim, the representation that the

Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when, in fact, the Fraudulent Services were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were actually performed, when, in many cases, the Fraudulent Services were not actually performed. Alpha Medicine, Webster, and Mendoza intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Alpha Medicine that were not reimbursable.

217.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,690,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by Alpha Medicine, Webster, and Mendoza through Alpha Medicine.

218.    Alpha Medicine, Webster, and Mendoza's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

219.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## SIXTH CAUSE OF ACTION

**Against Alpha Medicine, Webster, and Mendoza**
**(Unjust Enrichment)**

220.    GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-183, above.

221.    As set forth above, Alpha Medicine, Webster, and Mendoza have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

222.    When GEICO paid the bills and charges submitted or caused to be submitted by Alpha Mendoza, Webster, and Mendoza through Alpha Medicine, it reasonably believed that it was legally obligated to make such payments based on Alpha Medicine's improper, unlawful, and/or unjust acts.

223.    Alpha Medicine, Webster, and Mendoza have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Alpha Medicine, Webster, and Mendoza voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

224.    Alpha Medicine, Webster, and Mendoza's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

225.    By reason of the above, Alpha Medicine, Webster, and Mendoza have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,690,000.00.

## JURY DEMAND

226.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against Alpha Medicine, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Alpha Medicine has no right to receive payment for any pending bills submitted to GEICO;

B.    On the Second Cause of Action against Webster and Mendoza, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,690,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.    On the Third Cause of Action against Webster and Mendoza, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,690,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.    On the Fourth Cause of Action against Alpha Medicine, Webster, and Mendoza, compensatory damages in an amount to be determined at trial but in excess of $1,690,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.      On the Fifth Cause of Action against Alpha Medicine, Webster, and

Mendoza, compensatory damages in an amount to be determined at trial but in excess

of $1,690,000.00, together with costs and reasonable attorneys' fees pursuant to Fla.

Stat. § 501.211(2); and

F.      On the Sixth Cause of Action against Alpha Medicine, Webster, and

Mendoza, compensatory damages in an amount to be determined at trial but in excess

of $1,690,000.00, together with punitive damages, costs, interest and such other and

further relief as this Court deems just and proper.

Dated:          December 10, 2024

*/s/ Kristen Wenger*
Max Gershenoff (FBN 1038855)
John P. Marino (FBN 814539)
Kristen Wenger (FBN 92136)
Lindsey R. Trowell (FBN 678783)
RIVKIN RADLER, LLP
Riverplace Tower
1301 Riverplace Blvd.
Suite 1000
Jacksonville, FL 32207
Phone: (904) 792-8925
Facsimile: (904) 467-3461
Max.Gershenoff@rivkin.com
John.Marino@rivkin.com
Kristen.Wenger@rivkin.com
Lindsey.Trowell@rivkin.com
*Counsel for Plaintiffs*
